## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF IDAHO

---

| | |
|---|---|
| In Re: <br> **SHELTON S. BEACH and BEVERLY S. BEACH,** <br><br> Debtors. | **Bankruptcy Case No. 08-40013-JDP** |

---

| | |
|---|---|
| **SHELTON S. BEACH and BEVERLY S. BEACH, husband and wife, and R. SAM HOPKINS, TRUSTEE,** <br><br> Plaintiffs, <br> vs. <br><br> **WELLS FARGO BANK NA,** *as Trustee for the Holders of SARM 2005-14,* <br><br> Defendant. | **Adv. Proceeding No. 10-08114-JDP** |

---

### MEMORANDUM OF DECISION

---

**Appearances:**

Brent T. Robinson, ROBINSON, ANTHON & TRIBE, Rupert, Idaho, Attorney for Shelton and Beverly Beach, Plaintiffs.

MEMORANDUM OF DECISION - 1

Jim A. Spinner, SERVICE & SPINNER, Pocatello, Idaho, Attorney for
R. Sam Hopkins, Plaintiff.

Robert A. Faucher, HOLLAND & HART, Boise, Idaho, Attorney for
Defendant.

## Introduction

To ward off a non-judicial foreclosure action by a lender against

their home, chapter 7[1] debtors Shelton and Beverly Beach ("Debtors"),

commenced this action[2] against Wells Fargo Bank, N.A. ("the Bank"),[3]

alleging violations of the Truth in Lending Act, 15 U.S.C. §§ 1601 *et seq*.

("TILA").  Both the Bank and Debtors have now moved for summary

---

[1]  Unless otherwise indicated, all chapter and section references are to the
Bankruptcy Code, 11 U.S.C. §§ 101–1532, and all rule references are to the
Federal Rules of Bankruptcy Procedure, Rules 1001–9037.

[2]  Debtors originally filed their complaint in state court.  *See* Dkt. No. 1.
The action was thereafter removed to U.S. District Court for Idaho, and then
referred to this Court.  Dkt. Nos. 3, 22.

[3]  As the result of certain post-loan transactions, Debtors' loan and
mortgage is now included in a Structured Adjustable Rate Mortgage Loan trust
("SARM").  Title to the mortgage is held by the Bank, but solely as trustee for the
SARM.   References in this decision to actions taken by "the Bank" includes
actions by both the Bank and its predecessors in interest.

MEMORANDUM OF DECISION - 2

judgment concerning whether TILA violations indeed occurred.  A hearing

on the motions was held July 13, 2011, at which time the Court denied

Debtors' motion for summary judgment because an outstanding genuine

issue of material fact remained regarding whether the parties' transaction

is covered by TILA.  At the same time, because the Bank's motion may

potentially be resolved even assuming TILA applies, the Court took that

motion under advisement.  Having considered the record, the parties'

submissions, and applicable law, this Memorandum disposes of the Bank's

motion.  Rules 7052, 9014.

## Facts[4] and Procedural Background

In early 2005, Debtors decided to refinance the existing mortgage

loan on their Blackfoot home.  They applied for a new mortgage loan on

January 23, 2005.  At that time, Debtors received from the Bank, and

signed, a "Good Faith Estimate" setting forth a variety of details about

their anticipated loan.

---

[4] These facts are taken from the briefs, the affidavits submitted by the
parties, and the loan documents.  Unless otherwise noted, they appear to be
undisputed.

MEMORANDUM OF DECISION - 3

The refinance loan closed on March 7, 2005.  At closing, Debtors were asked to review, approve, and, in some cases, sign, several additional loan-related documents, including an Adjustable Rate Note ("Note"), a Truth in Lending Disclosure Statement ("TILDS"), and an Adjustable Rate Mortgage Loan Program Disclosure ("Loan Program Disclosure").  The information contained in each document must be considered to determine whether, as Debtors allege, the Bank violated TILA.

## I.    The Adjustable Rate Note.

Debtors' new loan was evidenced by the Note, the relevant terms of which are identified below.

1. <u>Principal</u>.  Debtors promised to pay Bank $145,000, plus interest, ("Principal") as consideration for the loan.  The Note provided that "[t]he Principal amount may increase as provided under the terms of this Note," but that it would never exceed 115% of the amount of the original "Principal."

2. <u>Interest</u>.   The Note's terms governing interest provide:

MEMORANDUM OF DECISION - 4

> Interest will be charged on unpaid Principal until
> the full amount of Principal has been paid.
> [Debtors] will pay interest at a yearly rate of
> 1.000%.  The interest rate [Debtors] will pay may
> change.

Note at ¶ 2(A), Dkt. No. 50-5 at 1.  According to the Note, the dates on

which the interest rate "may" change were May 1, 2005, and the first of

every month thereafter.   After May 1, 2005, Debtors' adjusted interest rate

was to be based on an index,[5] and was to be calculated by adding 2.875%

to the most recent index figure available as of 15 days before the first of

each month.   The results were to be rounded to the nearest 0.125%, and

applied a month at a time.  Because of the manner in which post-May 1,

2005, rates were calculated, those rates would never fall below 2.875%.

   3.  <u>Payments</u>.  Debtors were required to make payments on the Note

balance on the first day of each month, beginning May 1, 2005, until all

Principal, interest, and other loan charges were paid.  The payments were

to be applied to satisfaction of accrued interest before any amounts were

---

   [5]  The index was "the 'Twelve-Month Average' of the annual yields on
actively traded United States Treasury Securities adjusted to a constant maturity
of one year."  Note at ¶ 2(C), Dkt. No. 50-5 at 1.

MEMORANDUM OF DECISION - 5

applied to Principal.  While Debtors' interest rates under the Note changed

monthly, their payment amount typically changed annually, with the first

change occurring May 1, 2006, and subsequent changes generally being

made May 1, of each successive year.  Until May 1, 2006, the minimum

monthly payment on the Note was to be $466.38.

For each annual recalculation, the monthly payment amount for the

coming year was based on the amount necessary to pay off the loan using

the then-current interest rate ("Full Payment").  At the same time, for the

first five years of the loan, the amount Debtors were legally obligated to

pay each month was subject to a 7.5% annual payment increase cap

("Limited Payment").

The option of making a Limited Payment or a Full Payment was

Debtors'.  The motivation for making a Full Payment was that, at times,

making a Limited Payment would not be sufficient to cover the interest

due under the loan.  In that event, the loan's Principal would actually

increase as a result of the payment shortfall.  In such cases, the Note

provided that "negative amortization *will* occur" if only a Limited

MEMORANDUM OF DECISION - 6

Payment is made.  Note at ¶ 3(C), Dkt. No. 50-5 at 2 (emphasis added).

## II.     Truth in Lending Disclosure Statement.

The TILDS given to Debtors at closing recites the amount financed ($141,651.24), the finance charge ($146,959.67), the total amount of payments ($288,610.92), and the annual percentage rate (5.013%).  The entries for the finance charge and annual percentage rate are highlighted.[6]

The TILDS also includes a Payment Schedule, which states the number and amount of each payment, and the date when each payment amount begins.  The Payment Schedule is introduced by the phrase, "Your Payment Schedule Will Be," and states:

| Number of Payments | Amount of Payments | Payments are Due Monthly, Beginning |
|---|---|---|
| 12 | 466.38 | 05/01/05 |
| 12 | 501.36 | 05/01/06 |

---

[6] The annual percentage rate and the finance charge are set apart from other information in the form in "heavier" boxes.  In addition, while most of the TILDS' information is in mixed upper- and lower-case letters, the words "Annual Percentage Rate" and "Finance Charge" are highlighted in bold, upper-case letters.

MEMORANDUM OF DECISION - 7

| 12 | 538.96 | 05/01/07 |
| 12 | 579.38 | 05/01/08 |
| 12 | 622.83 | 05/01/09 |
| 299 | 853.68 | 05/01/10 |
| 1 | 853.68 | 04/01/35 |

Dkt. No. 56-3.

Finally, the TILDS includes miscellaneous information about the mortgage, noting that it contained a variable rate feature; that it does not have a demand feature; that Debtors provided a security interest in their home to secure repayment of the loan; various assumption, prepayment, and late payment information; and a provision directing Debtors to consult their loan contract documents for additional information.

**III.    Adjustable Rate Mortgage Loan Program Disclosure.**

The Loan Program Disclosure provides information regarding the calculation of, and potential changes in, the loan's interest rate and payment amounts.  Dkt. 50-5 at 29–30.  In explaining payment calculations, the Loan Program Disclosure includes:

MEMORANDUM OF DECISION - 8

> Beginning with the 13th payment and every 12 months thereafter, we will calculate the amounts of the full payment and the limited payment. The full payment will be the amount sufficient to pay the unpaid balance in full by the maturity date at the interest rate in effect during the month preceding the payment change date. The limited payment will be your payment for the month preceding the payment change date increased by 7.5%. You will then have the choice each month of paying the lesser of the two, and if the limited payment is less than the full payment, you can choose to pay more than the limited payment up to and including the full payment for your monthly payment. *If you pay anything less than the Full Payment, which would not be sufficient to cover the interest due, the difference will be added to your loan amount. This means the balance of your loan could increase. This is known as "negative amortization."*

*Id.* (emphasis added).

## IV.    Procedural Background.

Debtors filed for chapter 7 bankruptcy relief on January 9, 2008. Bankr. No. 08-40013, Dkt. No. 1. Two months later, they stopped making payments on the Note. On September 28, 2008, the Bank was granted relief from the automatic stay, Bankr. No. 08-40013, Dkt. No. 37, and soon

MEMORANDUM OF DECISION - 9

thereafter, it initiated a non-judicial foreclosure action against Debtors'
home.

In response, Debtors filed a state court complaint against the Bank
on December 28, 2009, alleging that, in connection with the loan, the Bank
had violated both TILA and the Idaho Consumer Protection Act ("ICPA").
See Adv. No. 10-8114, Dkt. No. 1.  At Debtors' request, the state court
entered a Temporary Restraining Order ("TRO") prohibiting the Bank
from foreclosing on Debtors' home *nunc pro tunc* to January 13, 2010.   The
TRO was to remain in effect until the dispute was resolved on its merits.
That resolution has been delayed, in part because the Bank caused the
action to be removed to federal district court, which, in turn, referred the
action to this Court on November 17, 2010.  Since Debtors' prebankruptcy
claim against the Bank became property of the bankruptcy estate, chapter
7 trustee R. Sam Hopkins ("Trustee") joined the action against the Bank as
an indispensable party on January 13, 2011.  Dkt. No. 28.

The Bank filed a motion to dismiss this action on January 11, 2011,
based on two theories:  (1) that the statute of limitations on Debtors' TILA

MEMORANDUM OF DECISION - 10

and ICPA claims had run prior to the filing of this action; and (2) that the

claims stated in the complaint were property of the bankruptcy estate,

could only be raised by Trustee, and, therefore, the Court lacked subject

matter jurisdiction over the action because Debtors lacked standing to

raise the statutory claims.  Dkt. No. 25.

The Court held a February 9, 2011, hearing, and on February 25

entered a Memorandum Decision and Order concerning the motion.   Dkt.

Nos. 39, 40.  The Court dismissed the ICPA claims in the complaint as

time-barred.  However, the Court determined that the TILA violations

claims for recoupment were not barred by the limitations statutes, and

could be raised by either Debtors or Trustee.  *Id.*  Moreover, because of the

joinder of the Trustee as a party-plaintiff, the Bank's other arguments for

dismissal were also rejected.

Both Debtors and the Bank have now moved for summary

judgment.  Dkt. Nos. 46, 50.  A hearing on the parties' motions was held

July 13, 2011.  At the hearing, the Court identified an outstanding genuine

issue of material fact regarding the purpose for which Debtors obtained

MEMORANDUM OF DECISION - 11

the loan.  Therefore, the Court ruled that there was a question whether

TILA applied to the parties' transaction.  As a result, the Court determined

it could not grant Debtors' motion for summary judgment, and ordered

that Debtors' motion be denied.  At the same time, though, the Court

decided it could consider and resolve the Bank's arguments that it should

prevail even if TILA applies.[7]

The Bank contends its motion for summary judgment should be

granted for two reasons.  First, it argues that the loan documents provided

to Debtors fully comply with TILA.   Second, even if the loan documents

did not comply with TILA, the Bank asserts that, as an assignee of the

Note and mortgage, it cannot be liable for any TILA violation.   Debtors

and Trustee dispute both arguments.

As explained below, the Court agrees with the Bank as to its first

contention, and therefore, the Bank is entitled to a summary judgment

---

[7]  The Bank argued, and the Court agrees, that if TILA does not apply,
Debtors and Trustee can not recover for a TILA violation.  On the other hand,
assuming TILA applies, the Court can determine whether a TILA violation
occurred, and, if it did, whether the Bank, as the assignee of the original Note, is
liable for damages attributable to that alleged violation.

MEMORANDUM OF DECISION - 12

dismissing this action.  Because there was no TILA violation, it is

unnecessary for the Court to examine the Bank's liability as an assignee.

### Discussion

## I.     Summary judgment standard.

Summary judgment is appropriate "if the pleadings, the discovery

and disclosure materials on file, and any affidavits show that there is no

genuine issue as to any material fact and that the movant is entitled to

judgment as a matter of law."  Rule 7056 (incorporating Fed. R. Civ. P.

56(a)).

In their opposition to the Bank's motion, Debtors include a

"Response to the Defendants (sic) Statement of Undisputed Facts."  Besides

their response regarding the transaction's purpose, Debtors appear to

generally agree with the facts presented by the Bank.  While the parties

disagree about the legal consequences flowing from the undisputed facts,

there are no genuine issues of material fact beyond whether TILA applies

to the transaction in question.  Therefore, if, as a matter of law, it is shown

that there was no TILA violation, the Bank is entitled to an award of

MEMORANDUM OF DECISION - 13

summary judgment even assuming TILA applies to the pertinent

transaction.

## II.     Compliance with TILA.

TILA was introduced to enhance economic stabilization, to

strengthen competition among financial institutions, and to protect

consumers from inaccurate and unfair credit practices through increasing

consumers' awareness of credit's costs.  *See* 15 U.S.C. § 1601(a).  Congress

delegated the duty to implement TILA to the Federal Reserve Board of

Governors; to fulfill that duty, the Board developed "Regulation Z" ("Reg.

Z"), which elucidates TILA's requirements.  15 U.S.C. § 1604(a); 12 C.F.R.

§ 226.1(a).  Reg. Z is generally given deference in determining TILA's

disclosure requirements.  *Rubio v. Capital One Bank*, 613 F.3d 1195, 1199

(9th Cir. 2010) (citing *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565

(1980)).  In addition, the Federal Reserve Board issues an Official Staff

Commentary interpreting Reg. Z ("Reg. Z Commentary"), which is also to

be given deference in TILA analyses.  *Chase Bank USA, N.A. v. McCoy*, __

U.S. __, 131 S.Ct. 871, 882 (2011).

MEMORANDUM OF DECISION - 14

The Bank asserts it should be awarded summary judgment because it has fully complied with TILA and Reg. Z.  Dkt. No. 50-1.  Debtors, however, argue that the Bank violated TILA and Reg. Z in several ways.  Dkt. No. 61.  First, Debtors assert that the Bank's TILDS does not reflect Debtors' actual legal obligation because it does not declare that the payment schedule and amounts included thereon were estimates.  Second, Debtors argue the TILDS does not accurately reflect the terms of their loan.  Third, Debtors contend that the Bank gave them insufficient disclosures about the potential for negative amortization on their loan.  Fourth, Debtors argue they were not provided the required Good Faith Estimate.  Each contention is addressed in turn below.

    1.  <u>The TILDS' use of estimates</u>.

Debtors allege the Bank violated TILA and Reg. Z by not conspicuously disclosing on the TILDS that the payment schedule and amounts included thereon are estimates.

As a general rule, TILA and Reg. Z require that disclosures "reflect the terms of the legal obligation between the parties."  12 C.F.R.

MEMORANDUM OF DECISION - 15

§ 226.17(c)(1).  Where information necessary for an accurate disclosure is unknown to a creditor when completing a truth in lending disclosure statement, Reg. Z requires the creditor to include "the best information reasonably available" to it at the time of disclosure and to "state clearly that the disclosure is an estimate."  12 C.F.R. § 226.17(c)(2)(I).

Debtors contend that, because their loan featured a variable rate of interest, and the interest rates and future payment amounts were unknown to the Bank when completing the TILDS, the TILDS necessarily includes interest rate and payment amount estimates, and the Bank was required to state as much.  Of course, if Debtors are correct, the consequences are profound to lenders, in that *all* variable rate transaction truth in lending disclosure statements would have to disclaim their disclosures as estimates.

As provided by the Reg. Z Commentary, however, variable rate loan transaction disclosures are not estimates.  *See* 12 C.F.R. pt. 226, Supp. I, cmt. 17(c)(1)-9 ("The variable-rate feature does not, by itself, make the disclosures estimates.").  Rather, where there is an initially discounted

MEMORANDUM OF DECISION - 16

interest rate, with subsequent rates based on an index or formula, lenders are to base the disclosed annual percentage rate in the TILDS on a composite of the initial rate for as long as it is charged, and on the rate that would have applied, per the formula, at the time of the transaction's consummation for the remainder of the term.  12 C.F.R. pt. 226, Supp. I, cmt. 17(c)(1)-10.  The finance charge, total of payments, and payment schedule are also to be calculated and disclosed in a manner that reflects the effect of multiple rates.  *Id.  See also Velazquez v. GMAC Mortg. Corp.*, 605 F.Supp.2d 1049, 1061–64 (C.D. Cal. 2008) (explaining that a composite annual percentage rate, and payment schedules reflecting multiple rates, are required in variable rate transactions).

The Bank's TILDS appears consistent with the Reg. Z Commentary's instructions to use a composite annual percentage rate and to reflect multiple rates in its other disclosures.  Despite Debtors' contention to the contrary, under TILA, the TILDS was not required to state that the information it contained was estimated for this variable interest rate loan. Therefore, the Bank did not violate TILA or Reg. Z by not providing such a

MEMORANDUM OF DECISION - 17

statement.

    2.  <u>The TILDS disclosures accurately reflect Debtors' loan terms</u>.

Relying upon their expert witness, Jerry Smith, Debtors assert the

TILDS payment schedule does not accurately reflect Debtors' loan.  Per

Debtors, this is so because Mr. Smith concluded, upon analyzing the

TILDS, that it does not mirror the Debtors' experience over the actual

history of the loan.  The Court, however, finds Mr. Smith's affidavit and

analysis unreliable for several reasons; the Court therefore declines to

accept Mr. Smith's analysis and conclusions.

First, Mr. Smith analyzed three different loan repayment scenarios,

founding two of those on the premise that the loan's principal amount was

$141,651.25.  The actual principal amount, however, was $145,000.[8]  The

fact that Mr. Smith based much of his payment schedule analysis on an

incorrect principal amount likely contributes to his conclusion that the

TILDS disclosures do not reflect the loan terms, and renders his opinions

---

[8]  The TILDS "Amount Financed" is $141,651.25, while the Note states the
Debtors borrowed $145,000.  At the hearing on these cross motions for summary
judgment, Debtors conceded that the principal amount was $145,000.

MEMORANDUM OF DECISION - 18

undependable.

Second, Mr. Smith did not conduct his analysis using an appropriate interest rate.  For variable rate transaction payment schedules, TILA disclosures must be given covering the transaction's full term, and "must be based on the terms in effect at the time of consummation."  12 C.F.R. pt. 226, Supp. I, cmt. 17(c)(1)-8.  Where a variable rate transaction has a discounted initial interest rate, the payment schedule should incorporate the initial payment period at the initial rate, with subsequent payments calculated at the interest rate in effect when the transaction was consummated.  *See* 12 C.F.R. pt. 226, Supp. I, cmt. 17(c)(1)-10.v.A (providing an example of a discounted variable rate transaction payment schedule).  If a loan has a payment cap, the effects of that cap should also be reflected in the payment schedule disclosures.  *See* 12 C.F.R. pt. 226, Supp. I, cmt. 17(c)(1)-10.v.C (providing an example of a payment schedule where the loan included a payment increase cap).

Per Debtors' Note, their loan had an initial, discounted interest rate of 1.000% until May 1, 2005.  Dkt. No. 50-5.  After that date, interest was to

MEMORANDUM OF DECISION - 19

be calculated based on a formula, adding a 2.875% margin to the Monthly

Treasury Average index. *Id.* At the time of loan consummation, the

formula interest rate was 4.875%. Dkt. No. 54 at 11–12. Debtors' TILDS

Payment Schedule reflects the initial discount rate of 1% for the first

twelve payments ($466.38). Dkt. No. 56-3. Beginning May 1, 2006, the

Payment Schedule includes twelve payments of $501.36 per month, which

is the payment then required to pay the Principal in full at 4.875%, capped

at a 7.5% annual increase. *See Id.* The next three years show similar, 7.5%

annual increases to the payment amount. *Id.* Finally, the Payment

Schedule shows 299 payments at $853.68, which reflects the monthly

payment required to pay the Principal after 60 months in full, plus interest,

at a rate of 4.875%. *See id.*

Debtors' expert, however, conducted his analyses under the

assumption that the interest rates applicable to Debtors' loan were: 1% for

the first year, 2% for the second year, 3% for the third year, 4% for the

fourth year, and 5% for every payment thereafter. *See* Dkt. No. 56. Based

on his analysis using those rates, Mr. Smith concluded that negative

MEMORANDUM OF DECISION - 20

amortization could not occur under the figures included in the TILDS

schedule.  Dkt. No. 56.  Therefore, Mr. Smith concluded the TILDS did not

accurately reflect the terms of Debtors' loan, because the loan actually

incurred negative amortization.  *Id.*

More than any other factor, however, interest rates determine

whether negative amortization occurs under Debtors' loan.[9]  All that Mr.

Smith proved in his analysis is that, if using interest rates that are not

founded in Debtors' Note, as he did, it is impossible for negative

amortization to occur.  This proves nothing about whether the TILDS

schedule reflects Debtors' loan.  Mr. Smith's analyses and affidavit

testimony are, therefore, unreliable.

At the same time, while Mr. Smith's analyses were based on fictional

---

[9] Negative amortization results under Debtors' loan when the interest required to be paid in a given month exceeds the payment required to be made in that month.  Note at ¶ 3(E), Dkt. No. 50-5.  The higher the interest rate, the greater the interest required to be paid, and the more likely that the payment will be insufficient to meet the interest requirement, resulting in negative amortization.  Mr. Smith's utilization of artificially low interest rates that are not based on Debtors' loan can not accurately predict the possibility for negative amortization under Debtors' loan.

MEMORANDUM OF DECISION - 21

interest rates, the TILDS Payment Schedule incorporated the requirements of TILA and Reg. Z.

3.  <u>The Bank sufficiently disclosed negative amortization</u>.

Debtors argue that the Bank inadequately disclosed the probability of negative amortization, and that more exacting negative amortization disclosures should have been included in both the TILDS and the Adjustable Rate Rider to "reflect the terms of the legal obligation between the parties." *See* 12 C.F.R. § 226.17(c)(1); Debtors' Opposition at 6, Dkt. No. 61.

In 2005, when the transaction was consummated, negative amortization disclosures were not required in truth in lending disclosure statements.[10]  *See* 12 C.F.R. § 226.18 (2005).  *See also Wallace v. Midwest Fin. & Mortg. Servs., Inc.*, 728 F.Supp.2d 906, 917 (E.D. Ky. 2010) (finding that Reg. Z does not require negative amortization disclosures to be made in a truth in lending disclosure statement).  At the same time, while not

---

[10]  12 C.F.R. § 226.18(s), added in 2010, requires, among other things, certain disclosures for negative amortization loans.

MEMORANDUM OF DECISION - 22

required, creditors could make additional TILDS disclosures, if "directly related" to the required disclosures.  12 C.F.R. pt. 226, Supp. I, cmt. 17(a)(1)-5.  Among information deemed to be directly related to required disclosures was "[a] brief reference to negative amortization in variable-rate transactions."  12 C.F.R. pt. 226, Supp. I, cmt. 17(a)(1)-5.viii.  Therefore, at its option, a lender "may include a short statement such as 'Unpaid interest will be added to principal.'"  *Id.*  The Bank was not required to make such a TILDS disclosure, however, and did not violate TILA or Reg. Z in deciding not to do so.

Though a TILDS negative amortization disclosure was not required of the Bank, it was required to make such a disclosure in the Loan Program Disclosure provided to Debtors with their loan application form.  *See* 12 C.F.R. § 226.19(b)(2).  The Loan Program Disclosure was required to include, "[a]ny rules relating to changes in the index, interest rate, payment amount, and outstanding loan balance including, for example, an explanation of interest rate or payment limitations, negative amortization, and interest rate carry-over."  12 C.F.R. § 226.19(b)(2)(vii).  Per the Reg. Z

MEMORANDUM OF DECISION - 23

Commentary:

> A creditor must disclose, where applicable, the
> possibility of negative amortization.  For
> example, the disclosure might state, "If any of
> your payments is not sufficient to cover the
> interest due, the difference will be added to your
> loan amount." . . . If a consumer is given the
> option to cap monthly payments that may result
> in negative amortization, the creditor must fully
> disclose the rules relating to the option, including
> the effects of exercising the option (such as
> negative amortization will occur and the
> principal loan balance will increase) . . . .

12 C.F.R. pt. 226, Supp. I, cmt. 19(b)(2)(vii)-2.

The loan transaction in this case is similar to that described in the

Reg. Z Commentary.  Under the Note's terms, Debtors were given the

option to cap monthly payment increases at 7.5% each year for the first

five years.  Note at ¶ 3(D), Dkt. No. 50-5.  Depending on changes to

Debtors' interest rate, the payment increase caps could result in negative

amortization.  Note at ¶ 3(E), Dkt. No. 50-5.  At the same time, Debtors had

the option of making a Full Payment each month, thereby avoiding any

negative amortization.  Note at ¶ 3(D), Dkt. No. 50-5.  Pursuant to the Reg.

MEMORANDUM OF DECISION - 24

Z Commentary, the Bank was, therefore, required to disclose to Debtors

that negative amortization would occur if they chose to only pay the

capped Limited Payment.

Debtors were given a Loan Program Disclosure on March 7, 2005.[11]

Dkt. No. 50-5 at 29–30.  Included in this document are statements

identifying the 7.5% payment increase cap, indicating Debtors had a choice

of paying the Full Payment amount or the capped amount each month,

and providing that:

> If [Debtors] pay anything less than the Full
> Payment, which would not be sufficient to cover
> the interest due, the difference will be added to
> [their] loan amount.  This means the balance of
> [Debtors'] loan could increase.  This is known as
> "negative amortization."

*Id.*  This language complies with the Reg. Z Commentary disclosure

information, and, thus, meets the TILA and Reg. Z requirements.  *See*

*Wallace*, 728 F.Supp.2d at 917–18 (finding that, for a loan substantially

---

[11] No evidence was presented to show an earlier loan program disclosure
was provided, and no argument as to the Loan Program Disclosure's timeliness
was raised by the parties.

MEMORANDUM OF DECISION - 25

similar to Debtors',  loan program disclosure language that is nearly

verbatim to Debtors' was sufficient to disclose the possibility of negative

amortization).

Finally, Debtors also assert their Adjustable Rate Rider should have

disclosed that negative amortization was certain to occur.  In doing so,

they rely on *Mincey v. World Savs. Bank, FSB*, 614 F.Supp.2d 610 (D.S.C.

2008), for the proposition that, where negative amortization is a certainty,

any indication in a note that it is only a possibility is misleading and a

violation of TILA.

As an initial matter, however, negative amortization was not a

certainty in this case.  *See Taylor v. Homecomings Fin., LLC*, 738 F.Supp.2d

1257, 1265–66 (N.D. Fla. 2010) (explaining that, where a debtor has the

option of paying a limited payment or a full payment, and only the full

payment will avoid negative amortization, it is "likely *but not certain* that

some payments would result in negative amortization." (emphasis

added)).  Negative amortization was only certain to occur *if* the Debtors

chose to make a Limited Payment, rather than a Full Payment, and *if* the

MEMORANDUM OF DECISION - 26

Limited Payment was insufficient to cover the interest due on the Note.

Note at ¶¶ 3(D), 3(E), Dkt. No. 50-5.  In those cases, the Note and the

Adjustable Rate Rider both clearly provide:

> For each month that [Debtors'] monthly payment
> is less than the interest portion, the Note Holder
> will subtract the amount of [Debtors'] monthly
> payment from the amount of the interest portion
> and *will* add the difference to [Debtors'] unpaid
> Principal, and interest will accrue on the amount
> of this difference at the interest rate required by
> Section 2.

*See* Note at ¶ 3(E), Dkt. No. 50-5 at 2 (emphasis added); Adjustable Rate

Rider at ¶ 3(E), Dkt. No. 50-5 at 21.  Not only was negative amortization

not a certainty in all cases, but in those instances where it was certain to

occur, the Note and Adjustable Rate Rider provide as much.

Also, the disclosures required by 12 C.F.R. § 226.19(b)(2) are to be

provided in a "loan program disclosure."  Some decisions have applied the

12 C.F.R. § 226.19(b)(2) requirements to notes or truth in lending disclosure

statement documents.  *See, e.g.*, *Mincey*, 614 F.Supp.2d at 637–38 (applying

12 C.F.R. § 226.19(b) to truth in lending disclosure statement and payment

MEMORANDUM OF DECISION - 27

schedule disclosures); *Plascencia v. Lending 1st Mortg.*, 2008 WL 1902698 at

*5–6 (N.D. Cal. 2008) (applying 12 C.F.R. § 226.19(b)'s loan program

disclosure requirements to "disclosures" made within a note); *Mandrigues*

*v. World Savs., Inc.*, 2008 WL 1701948 at *1–2 (N.D. Cal. 2008) (same).

However, nothing in 12 C.F.R. § 226.19(b)(2) indicates that the required

disclosures are to be made anywhere other than in a Loan Program

Disclosure.  *See also Wallace*, 728 F.Supp.2d at 917 (concluding  that Reg. Z

does not require negative amortization disclosures to be made in a truth in

lending disclosure statement, and looking to the debtor's loan program

disclosure to verify whether appropriate disclosures were made).

 In this case, the Bank provided negative amortization disclosures in

the Loan Program Disclosure document given to Debtors with their loan

application.  Those disclosures were sufficient to alert Debtors of the

possibility of negative amortization, and no additional negative

amortization disclosures were required to comply with TILA and Reg. Z.

 4.  <u>The Bank Gave Debtors a Good Faith Estimate</u>.

 Debtors assert they were never given a Good Faith Estimate, and

MEMORANDUM OF DECISION - 28

that it was impossible for the Bank to have provided them an Estimate

within the deadlines established by TILA and Reg. Z.  Good Faith

Estimates are required to be provided by the lender to a consumer no later

than the third business day after a creditor receives the consumer's written

application, and at least seven days before a transaction is consummated.

*See* 12 C.F.R. §§ 226.19(a)(1)(I), (2)(i).  Debtors represent the Bank did not

receive their application until the March 7, 2005, closing.

In support of its motion, however, the Bank submitted a signed loan

application dated January 23, 2005, and proved Debtors were provided a

Good Faith Estimate that same day.  Dkt. No. 57-3 at 8–13.[12]  The Bank did

not violate the TILA and Reg. Z Good Faith Estimate requirements.

### III.    The Bank's status as an assignee.

The Bank asserts that the loan documents in this case did not violate

TILA or Reg. Z, and Debtors have not shown otherwise.  Because there

was no TILA violation, the Court need not analyze whether the Bank

---

[12]  Apparently, Debtors completed another loan application on the day of
closing.

MEMORANDUM OF DECISION - 29

would be liable for any TILA violation as an assignee of the initial Note.

**Conclusion**

Even if TILA applies to the transaction between the Bank and

Debtors, the Bank did not violate TILA, and is entitled to judgment as a

matter of law.  The Bank's motion for summary judgment will, therefore,

be granted, and this action will be dismissed, in a separate order and

judgment.[13]

Dated:  August 1, 2011

_____
Honorable Jim D. Pappas
United States Bankruptcy Judge

---

[13]  At the July 13, 2011, hearing on the cross motions for summary judgment, the Court also took under advisement:  the Bank's Motion to Strike Affidavit of Shelton Beach, Dkt. No. 58; the Bank's Motion to Strike Affidavit of Beverly Beach, Dkt. No. 64; and the Bank's Motion for Rule 56(d) Relief, Dkt. No. 67.  As a result of the Court's ruling, it is unnecessary to address the Bank's other motions, and those motions will be denied as moot in this decision's companion order.

MEMORANDUM OF DECISION - 30